[No. E012047. Fourth Dist., Div. Two. May 6, 1993.]

THE PEOPLE, Plaintiff and Appellant, v.
CLINTON B. SQUIRE, Defendant and Respondent.

## COUNSEL

Grover C. Trask II, District Attorney, and Gary B. Tranbarger, Deputy District Attorney, for Plaintiff and Appellant.

Gerald D. Polis for Defendant and Respondent.

## OPINION

**McKINSTER, J.**—Pursuant to California Rules of Court, rule 62 et seq., we accepted a transfer of this case from the Appellate Department of the Riverside Superior Court. The sole issue presented by this appeal is the adequacy of the advance publicity of a sobriety checkpoint. The trial court found there was insufficient advance publicity for the checkpoint, and consequently, it granted a motion brought pursuant to Penal Code section 1538.5 suppressing all evidence seized after the defendant was detained in it. The district attorney appealed to the appellate department which reversed the trial court. The defendant then petitioned for a rehearing or in the alternative for certification to this court. We agree the lower court erred in granting the motion to suppress and reverse.

### FACTS

During the Labor Day weekend on Friday, August 30, 1991, around 7:30 p.m. the defendant was driving his car on city streets when he entered a

sobriety checkpoint being operated on Van Buren north of Philbin. A Riverside city policeman observed the defendant displaying objective signs of intoxication. An investigation ensued which led to the arrest of the defendant for a violation of Vehicle Code section 23152, subdivisions (a) and (b). He later gave a breath sample that measured a .08 percent blood-alcohol level.

In municipal court the defendant brought a motion pursuant to Penal Code section 1538.5 to suppress all evidence seized after the defendant entered the checkpoint based solely on the insufficiency of the advance publicity of the checkpoint. An evidentiary hearing was held on that issue.

At that hearing Detective James Cannon testified that he was the public information officer. On August 28, 1991, he prepared a press release announcing a sobriety checkpoint to be conducted on August 30, 1991, and placed it in the public information area at the front counter of the police department. Cannon contacted the three major television networks by telephone advising them of the particulars of the checkpoint. Additionally, Cannon contacted the Press-Enterprise, a morning daily newspaper of countywide circulation, El Contacto, a local Hispanic newspaper, and the Black Voice, a local African-American newspaper.

Detective Cannon testified that to his knowledge the only publicity his efforts actually garnered was an article that appeared in the Press-Enterprise on the morning of August 30, 1991.[1]

The court took the motion to suppress under submission and later granted the motion in a written decision. It found that the single article published on the date the checkpoint was instituted did not constitute substantial notice, and therefore, the checkpoint was not constitutionally valid. The court stated that for advance notice to the public to be valid "[t]here must be a substantial likelihood that a majority of the public will become aware of the pending checkpoint. . . ." A day later the court dismissed all charges against the defendant.

## DISCUSSION

In *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321 [241 Cal.Rptr. 42, 743 P.2d 1299], the Supreme Court found the use of sobriety checkpoints did not

---

[1]The article appeared under the headline, "Weekend Sobriety Checkpoint Slated." It read:

"The Riverside Police Department will set up a sobriety checkpoint in the south end of the city during the Labor Day weekend, officials reported.

"Officers will set up one checkpoint for driving under the influence and to check seat belt use from 6 p.m. today through 2 a.m. Saturday on a Riverside surface street. The exact location is being withheld.

"Lights and signs will indicate when motorists are approaching the checkpoint, according to police spokesman Jim Cannon, and motorists will have an opportunity to avoid the stop."

violate the state or federal Constitutions. The court found that such checkpoints were not criminal investigations, but rather they serve the regulatory function of "keeping intoxicated drivers off the highways to the end of advancing public safety." (*Id.*, at p. 1335.) In reaching its conclusion that checkpoint detentions meet the standard of reasonableness under both constitutions the court used the balancing test enunciated in *Brown* v. *Texas* (1979) 443 U.S. 47 [61 L.Ed.2d 357, 99 S.Ct. 2637]. That test determines the lawfulness of a detention or seizure by balancing the public interest served by the seizure, the degree to which the seizure advances that public interest, and the severity of the interference with individual liberty. (*Id.*, at pp. 50-51 [61 L.Ed.2d at pp. 361-362.)

In *Ingersoll* v. *Palmer, supra,* 43 Cal.3d 1321 at page 1341 the court considered cases from other jurisdictions bearing on the severity of interference with individual liberty, the third balancing factor of *Brown* v. *Texas, supra,* 443 U.S. 47, and synthesized from them standards which provide eight "functional guidelines for minimizing the intrusiveness of sobriety checkpoint stops."[2] The eighth functional guideline, advance publicity, is the only one at issue in the present appeal.

"Advance publicity is important to the maintenance of a constitutionally permissible sobriety checkpoint. Publicity both reduces the intrusiveness of the stop and increases the deterrent effect of the roadblock." (*Ingersoll* v. *Palmer, supra,* 43 Cal.3d. at p. 1346.) Having said that, the court is then silent regarding the nature and scope of publicity necessary to satisfy the advance publicity guideline. It provided no specific guidance concerning what would constitute adequate advance publicity nor do any subsequent cases address the issue. Nothing is mentioned regarding how far in advance publicity should occur, its duration of time, or over what geographic area the publicity should be disseminated. The opinion is also silent regarding what medium or combination of media would be adequate. (E.g., leaflets, press releases, placement of billboards or other temporary signs in the general area of the checkpoint before it is operated, posting of notice in the courthouse lobby, print media, radio and television.)

California is a pluralistic society. Is advance publicity in English alone sufficient or should there also be publicity in Spanish or some other language where there is a substantial community of non-English speaking people living in the general area of the checkpoint? Again, *Ingersoll* is silent.

[2]They are: (A) decisionmaking at the supervisory level; (B) limits on the discretion of the field officers; (C) maintenance of safety conditions; (D) reasonable location; (E) time and duration; (F) indicia of the official nature of the roadblock; (G) length and nature of the detention; and (H) advance publicity. (43 Cal.3d at pp. 1341-1347.)

An interesting unanswered question raised by the decision in *Ingersoll* v. *Palmer, supra,* 43 Cal.3d 1321 is whether the eight "guidelines" are in fact merely directory guidelines or factors to be considered and weighed in determining the constitutionality of a checkpoint or whether they are mandatory prerequisites to a constitutionally valid checkpoint. The *Ingersoll* court stated, "Advance publicity is important to the maintenance of a *constitutionally permissible* sobriety checkpoint." (*Id.,* at p. 1346, italics added.) This suggests it is a mandatory requirement. However, in its discussion of publicity at page 1346, the court stated that publicity helps to establish in the minds of motorists the legitimacy of sobriety checkpoints and cited *Jones* v. *State* (Fla.Dist.Ct.App. 1984) 459 So.2d 1068, 1079-1080, a case which states advance publicity may not be a constitutional requirement for all sobriety checkpoints. The *Jones* court observed that advance publicity reduced surprise, fear, and inconvenience, and the *Ingersoll* court found that observation consistent with finding reasonableness under the Fourth Amendment. (*Ingersoll* v. *Palmer, supra,* 43 Cal.3d at pp. 1346-1347.)

In *People* v. *Morgan* (1990) 221 Cal.App.3d Supp. 1 [270 Cal.Rptr. 597], the only California case on the issue of advance publicity, the police agency sent a notice to the Bay City News and made a phone call to it 24 to 48 hours before the checkpoint was to be established, but there was no actual publicity generated. The People there contended that advance publicity was not a prerequisite to a constitutionally valid checkpoint but merely one of several guidelines offered by *Ingersoll* v. *Palmer, supra,* 43 Cal.3d at pages 1341-1347, to ensure a balance between the governmental and individual interests involved.

The *Morgan* court acknowledged that "[*I*]*ngersoll* does not expressly state that police departments must strictly apply each of the eight factors. [¶] Nevertheless, from the standpoint of the ultimate purpose and legal theory supporting administrative motorist detentions, we hold that advance warning and publicity of sobriety checkpoints is essential if such checkpoints are to serve as an effective deterrent, because it may be impossible to deter an uninformed public. *Ingersoll*'s requirement of 'substantial advance publicity' means that checkpoint authorities must do more than simply inform the press about their plan to operate a checkpoint. To be constitutionally permissible, the press relations strategy implemented by the authorities must actually generate 'substantial publicity.'" (221 Cal.App.3d at p. Supp. 4.)

The People contend that *People* v. *Morgan, supra,* 221 Cal.App.3d Supp. 1 is wrongly decided. *Ingersoll* v. *Palmer, supra,* 43 Cal.3d 1321 does not expressly require that there be "substantial advance publicity." *Ingersoll* only stated that "advance publicity is important to the maintenance of a

constitutionally permissible sobriety checkpoint." (*Id.*, at p. 1346.) The court then commented that the record then before it showed "substantial advance publicity" in fact accompanied the operation of the checkpoints. (*Id.*, at p. 1347.)

It is also clear that the *Morgan* court went significantly beyond the express holding in *Ingersoll*, as it readily admitted, in holding that advance publicity was not just a guideline but an essential prerequisite since the validity of sobriety checkpoints is premised on their deterrent effect. The *Morgan* court reasoned you cannot deter an uninformed public. (*People* v. *Morgan, supra*, 221 Cal.App.3d at p. Supp. 4.)

The People contend that the advance publicity factor is fundamentally different from the other seven factors discussed in *Ingersoll*. The first seven factors pertain to the detention itself, and nothing in *Ingersoll* or *Morgan* requires that the motorist detained in the checkpoint actually receive advance notice. The publicity merely advises broadly of the time and place the checkpoint is to operate, and the court approves of such generalities because the uncertainty as to the exact time and place only increases the deterrent effect of the notice.

The People contend that this distinction has constitutional significance because the balancing test required by the constitution considers only the person detained and the governmental interest in the detention. How the government acts towards people who are not detained is not relevant. There is no requirement that publicity actually reach the person detained; therefore, the People contend that publicity is outside the scope of the constitutional balancing test.

The People argue that there is a further distinction. *Ingersoll*'s first seven factors are totally within police control whereas the police cannot control publicity. The police can only release information to the media. The media alone can choose whether to publicize the information or not. This contention is meritless. There are many other forms of publicity within the control of the police, such as the placement of signs in the general area of the checkpoint before the checkpoint is actually instituted, and the police have access to the print media through paid legal notices or ordinary commercial advertising in a newspaper of wide circulation in the general area of the checkpoint.

After the decisions in *Ingersoll* v. *Palmer, supra*, 43 Cal.3d 1321 and *People* v. *Morgan, supra*, 221 Cal.App.3d Supp. 1, the United States Supreme Court issued its decision in *Michigan State Police Dept.* v. *Sitz* (1990)

496 U.S. 444 [110 L.Ed.2d 412, 110 S.Ct. 2481]. In that case, the court considered a sobriety checkpoint operated in substantially the same manner as the one in *Ingersoll*. The court went through the same balancing test as in *Ingersoll*, and it reached the same conclusion that such checkpoints were constitutionally valid.

In *Michigan State Police Dept.* v. *Sitz, supra,* 496 U.S. 444 the sobriety checkpoint was established pursuant to advisory committee guidelines, similar to those in *Ingersoll*, that set forth procedures governing the operation of the checkpoint, site selection, and publicity. The People contend that the majority opinion in *Sitz* never discusses the issue of advance publicity, let alone making it a requirement for the constitutionality of the checkpoint. From this silence the People contend that advance publicity is not a factor in determining the constitutional validity of a checkpoint.

The People claim that we should follow *Sitz*, and not *Ingersoll*, insofar as *Ingersoll* might be interpreted to require advance publicity as a requirement for the validity of the checkpoint. The opinion in *Sitz* does not specifically predicate the constitutionality of the checkpoint on advance publicity. The People claim that we need not follow *Ingersoll* and are required to follow *Sitz* because since the passage of Proposition 8, California courts have not been free to place higher restrictions on the admissibility of seized evidence than required by the federal Constitution.[3] (*In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].)

In spite of having set out the contentions at great length for a thorough understanding of the issue presented in this appeal, we determine that we need not decide whether advance publicity is a prerequisite to a constitutionally valid checkpoint. We shall assume for the purpose of our discussion, without actually deciding, that advance publicity is required for constitutional validity. We hold that the advance publicity actually given in the present case was adequate.

Unlike *People* v. *Morgan, supra,* 221 Cal.App.3d Supp. 1, in the present case there was publication of an article advising of the checkpoint in the morning edition of the newspaper with the largest countywide circulation prior to the commencement of its operation at 6 p.m. that same day. We find this article sufficient to meet the advance publicity guideline of *Ingersoll* v.

---

[3]We are aware that this precise contention was rejected by Division Three of this court in *People* v. *Banks** (Cal.App.). The court concluded that advance publicity is necessary to operate a constitutionally valid checkpoint. The California Supreme Court has granted review, and therefore, it may not be cited as authority.

*Reporter's Note: For Supreme Court opinion see 6 Cal.4th 926.

*Palmer, supra*, 43 Cal.3d 1321, 1346 even if that opinion were read to require substantial advance publicity as *People* v. *Morgan, supra*, 221 Cal.App.3d at page Supp. 4 erroneously states *Ingersoll* requires. There is no authority requiring a person detained in a sobriety checkpoint to have actually received the publicity let alone the trial court's unworkable holding in the present case that there must be a substantial likelihood that a majority of the public will become aware of an impending checkpoint.[4]

The defendant contends that the People should have a reasonably high burden to show advance publicity. He argues a single article is insufficient, and there are numerous alternatives to newspapers, radio, and television that were not used by law enforcement in the present case, such as the dissemination of flyers, use of billboards, and advance placement of signs in the general area of the roadblock to warn of the checkpoint that will be operated later.

The advance publicity guideline is a judicial creation. *Ingersoll* v. *Palmer, supra*, 43 Cal.3d 1321, as has been previously noted, provides no guidance regarding what methods of publicity are adequate, the geographical area over which publicity should be disseminated, how far in advance publicity must be given, or what duration of time is required.

The court stated in *Ingersoll* v. *Palmer, supra*, 43 Cal.3d at page 1345 in its discussion of the fifth guideline, concerning the time and duration of a checkpoint, that it could not establish set rules governing the time of day and duration of checkpoints. Likewise, it is impossible for us to draw any hard and fast rules to govern the sufficiency of advance publicity. Law enforcement will be expected to exercise good judgment in giving advance publicity to the public, keeping in mind that publicity serves the purposes of deterring driving after alcohol consumption, legitimizing checkpoints in the minds of the public, and lessening intrusiveness by reducing surprise, fear and inconvenience. We decline to devise a specific detailed scheme for the implementation of the advance publicity guideline. Any attempt by us to prescribe such a scheme would result in a rule too inflexible, complex and unworkable for law enforcement to implement. The reasonableness and adequacy of advance publicity will simply depend on the facts of each situation on a case-by-case basis.

---

[4]The test proposed by the court is problematic in many respects, e.g., (1) Is the term public limited only to drivers or does it include others, including adults and minors, who may be passengers in a vehicle detained in the checkpoint? (2) Does the term public include persons traveling from outside the publication area into the checkpoint? (3) What test could a court use to determine whether a majority of the public actually received the information?

## Disposition

The order granting the motion to suppress and the order of dismissal are reversed.

Hollenhorst, Acting P. J., and Timlin, J., concurred.